# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Office of The Attorney General, | : | |
| | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 1553 C.D. 2015 |
| | : | |
| Narcotics Agents Regional | : | Argued: February 8, 2016 |
| Committee, FOP Lodge # 74, | : | |
| | : | |
| Respondent | : | |

BEFORE:     HONORABLE RENÉE COHN JUBELIRER, Judge
                   HONORABLE ANNE E. COVEY, Judge
                   HONORABLE DAN PELLEGRINI, Senior Judge

OPINION NOT REPORTED

**MEMORANDUM OPINION**
**BY JUDGE COHN JUBELIRER**                    **FILED:  April 26, 2016**

The Office of the Attorney General (OAG) petitions for review from the July 27, 2015 Arbitration Decision and Award  issued "In the Matter of Arbitration Between:  Narcotics Agents Regional Committee, FOP Lodge #74 and Commonwealth of Pennsylvania, Office of Attorney General (OAG)," American Arbitration Association Case No. 14-20-1400-0327 (Decision).  The Arbitrator sustained, in part, and denied, in part, the grievance filed by the Narcotics Agents Regional Committee, FOP Lodge #74 (Union) on behalf of Renee Magnotta (Agent Magnotta) when he concluded that OAG had just cause to discipline Agent Magnotta but reduced her discharge to a 30-day suspension without pay.  OAG argues here that the Decision should be vacated under the public policy exception to the essence test.  For the following reasons, we affirm.

Agent Magnotta was terminated from her position with OAG in November 2013, and timely grieved her discharge. Attempts to resolve the grievance using the contractual process were unavailing, and the grievance was referred to arbitration. The parties stipulated that the issue before the Arbitrator was: "Did the Office of Attorney General have just cause to discharge Grievant Renee Magnotta? If not, what shall be the remedy?" (Decision at 4.) The Arbitrator presided over a two-day hearing at which the parties presented testimony, documentary evidence and argument, and filed post-hearing briefs. The Arbitrator's Decision included a Statement of Relevant Facts,[1] the stipulated issue, the relevant provisions of the parties' Collective Bargaining Agreement (CBA) and OAG Policy,[2] Analysis, and the Award.

---

[1] Our summary of the Arbitrator's findings hews closely to the text of the decision, but omits names and other information not pertinent to our decision.

[2] The first two sections of Article 27 of the CBA, which is titled "DISCHARGE, DEMOTION, SUSPENSION & DISCIPLINE," provide as follows:

> Section 1. The Employer shall not demote, suspend, discharge or take any disciplinary action against an employee without just cause. An employee may appeal a demotion, suspension, or discharge beginning at the third step of the grievance procedure, within 15 working days of the date of its occurrence. The Union shall be notified promptly by the Employer of any suspension, discharge or demotion. The failure of the Employer to comply with the preceding notification requirements will not affect the validity of the action, but will suspend the time period set forth above until the notification is sent.
>
> Section 2. Any action instituted under Section 1 of this Article shall be implemented within a reasonable period of time after the event giving rise to such disciplinary action or knowledge thereof.

(CBA at 46, R.R. at 59a.) OAG's Code of Conduct for the Criminal Law Division, Criminal Investigations, provides in pertinent part:

> 202.5 UNBECOMING CONDUCT

*(Continued…)*

2

Agent Magnotta was employed by OAG as a narcotics agent from November 1989 until her discharge in November 2013. Her most recent assignment was to the drug diversion unit, which investigates prescription forgery involving medical professionals. (Decision at 1.) In the latter part of 2012 and in early 2013, Agent Magnotta was assigned to an investigation also involving the Scranton Police Department and the Federal Bureau of Investigation (FBI). At a meeting held in January 2013, Agent Magnotta's supervisors and FBI agents discussed an individual suspected of obtaining prescriptions from a physician who was the main investigative target, and decided at that time to arrest that individual. Thereafter, Agent Magnotta's supervisor directed her to prepare an arrest warrant and the affidavit of probable cause. (Decision at 1-2.)

Agent Magnotta prepared the warrant and affidavit which then were reviewed by a Deputy Attorney General. However, in Lackawanna County, any

> All personnel employed by the Office of Attorney General shall conduct themselves in a manner that will reflect favorably on the agency, to the public and the law enforcement community overall. Any conduct that may decimate respect and/or reflect unfavorably on the integrity of the Agency or the individual employee shall be considered UNBECOMING CONDUCT.
>
> 202.6 CONFORMANCE TO LAWS
> All agents shall conform to, and abide by, the Constitution and laws of the United States, the Commonwealth of Pennsylvania and its subdivisions.

(Code of Conduct at 202.5, .6, R.R. at 141a.) OAG's Operations Manual provides in pertinent part:

> 204.22 B. Reports (Duty Requirements)
> All reports submitted by Agents shall be factual and/or accurate. No Agent shall knowingly enter, or precipitate the entry of inaccurate, false or inappropriate information, date, distort the facts in any official investigative report or record.

(Final Investigative Summary at 5, R.R. at 138a.)

3

narcotics-related warrants must be approved by the District Attorney's office.[3] Agent Magnotta therefore sent the draft by email to a Lackawanna County Assistant District Attorney (ADA) for approval on January 11, 2013. The ADA was on vacation and neither read the email nor responded to it.[4] Agent Magnotta, in accordance with apparent custom in situations when she received the ADA's affirmative approval, signed his name on this warrant and left the pre-marked box showing "Approved" unchanged indicating approval of the warrant. The warrant was signed by a Magisterial District Justice (MDJ) on January 15, 2013. Shortly after the warrant was signed, Agent Magnotta, with a Scranton police officer, approached the individual subject to the warrant, told that individual that the warrant had been issued, and tried to gain the individual's cooperation. (Decision at 2.)

One of the FBI agents from the original meeting and the Scranton Police Officer referenced above met with the ADA upon his return from vacation. The FBI agent assumed that the ADA had approved the warrant and complained that the affidavit of probable cause contained sensitive information relevant to an independent investigation by the FBI involving the individual subject to the warrant. The ADA subsequently discovered Agent Magnotta's email seeking approval of the warrant and realized that it had not been reviewed or approved by anyone in the District Attorney's office. The ADA then directed Agent Magnotta

---

[3] Rule 507 of the Pennsylvania Rules of Criminal Procedure, Pa. R. Crim. P. 507, provides a local option whereby "[t]he district attorney of any county may require that criminal complaints" and/or affidavits of probable cause supporting arrest warrants must be approved by that office prior to filing.

[4] We can infer that the ADA did not have an automatic "out of office" reply activated.

4

to withdraw the warrant. Agent Magnotta advised her supervisors about the warrant and on January 24, 2013 had it withdrawn. (Decision at 2-3.)

OAG's Office of Professional Responsibility (OPR) investigated Agent Magnotta's actions. OPR found that when Agent Magnotta prepared and presented the unapproved warrant, she violated provisions of the OAG Operations Manual regarding Unbecoming Conduct, and provisions requiring agents to conform to laws and make accurate reports. OAG referred the matter to the Lackawanna County District Attorney's Office. That office declined prosecution. Following additional internal OAG review and Loudermill[5] proceedings, OAG on November 8, 2015, terminated Agent Magnotta's employment. (Decision at 3.)

In the Loudermill Notice, OAG advised Agent Magnotta that "[t]he underlying basis for potential disciplinary action involves your commission of the perjury-related offense of false swearing on January 15, 2013." (Loudermill Notice at 1, R.R. at 1a.) The Loudermill Notice stated further that:

> The misconduct cited above is not only inherently improper and contrary to your oath as a sworn law enforcement officer, it also threatens your credibility as a Narcotics Agent and impacts your ability to properly carry out your duties. Your misconduct further constitutes potential violations of 18 Pa. C.S.A. [sic] § 4902 - Perjury and 18 Pa. C.S.A. [sic] § 4903 - False Swearing, as well as violations of the OAG Criminal Law Division Operational Manual Section 202.5 - Unbecoming Conduct, Section 202.6 - Conformance to Laws, and Section 204.22 - Reports and provides just cause for discipline up to and including discharge.

---

[5] Cleveland Board of Education v. Loudermill, 470 U.S. 532, 538 (1985) (where a public employee has a property right in continued employment, the state cannot deprive the employee of that property without due process). Here, the Loudermill Notice provided Agent Magnotta with written notice of the potential discipline for her actions and the basis for that discipline, and allowed her to provide any additional mitigating information for OAG's consideration.

5

(Loudermill Notice at 3, R.R. at 3a.)  In the subsequent Notice of Termination, OAG stated that termination of Agent Magnotta's employment was the result of her actions on January, 15, 2013, in submitting the unapproved warrant to the MDJ, but eliminated the reference to perjury and false-swearing. The Notice of Termination repeated the rationale from the Loudermill Notice regarding "misconduct . . . inherently improper and contrary to [her] oath as a law enforcement officer" and cited the OAG Code of Conduct and Operations Manual provisions referenced above.  (Notice of Termination at 1-2, R.R. at 9a-10a.)

Before the Arbitrator, OAG relied upon the rationale from the Notice of Termination with the additional overlay that Agent Magnotta's actions adversely impacted her credibility and impacted OAG's ability to use her on future cases. (Decision at 8.)  Specifically, OAG argued that Agent Magnotta is unable to carry out her duties effectively because she could jeopardize every future case in which she would be involved based on the United States Supreme Court decision in Giglio v. United States, 405 U.S. 150, 153-54 (1972).[6]  The Arbitrator characterized the Union's view of the conduct as "a single, understandable mistake that caused no harm and occasioned no adverse consequences."  (Decision at 8 (internal quotation omitted).)

The Arbitrator viewed the conduct at issue to be Agent Magnotta's handling of the warrant approval process, (Decision at 9-11), and found no evidence to "support the conclusion that she intentionally, knowingly, and deliberately falsified the warrant or had any reason to do so," (Decision at 11).  Instead, the Arbitrator

_____

[6] Giglio, along with Brady v. Maryland, 373 U.S. 83, 87-88 (1963), establishes a rubric that due process requires that the prosecution must disclose to a defendant any available, favorable, material evidence, including but not limited to any information that may impeach the credibility of a prosecution witness, such as prior misrepresentations.

6

found that Agent Magnotta believed she had the required ADA-approval for the warrant, but that she "was wrong in assuming she had affirmative approval based on a lack of response." (Decision at 10.) The Arbitrator further found that "Agent Magnotta's assumption of approval was negligent, showed a careless disregard for proper procedure, and an indifference or disrespect for the approval process," that she "clearly violated the cited provision of the OAG Operational Manual regarding Unbecoming Conduct" such that her actions warranted serious discipline. (Decision at 10.) Based on the facts outlined above, the Arbitrator concluded that OAG had just cause to discipline, but not to discharge, Agent Magnotta. (Decision at 13.)

As a remedy, the Arbitrator directed OAG to reduce Agent Magnotta's discharge to a 30-day suspension without pay. He further directed OAG to reinstate Agent Magnotta to her former position without loss of seniority and to make whole Agent Magnotta's losses resulting from the discharge by paying her back pay and benefits from the date of her discharge less the 30-day suspension and any interim earnings. (Decision at 14.)

We review arbitration awards under Act 195[7] through the rubric of the "essence test." Our inquiry under the essence test is whether the arbitrator's decision draws its "essence" from the CBA. Westmoreland Intermediate Unit #7 v. Westmoreland Intermediate Unit #7 Classroom Assistants Educational Support Personnel Association, 939 A.2d 855, 863 (Pa. 2007) (Westmoreland I). Judicial review of arbitration awards under the essence test is "circumscribed" and does not permit an inquiry as to whether an award is "manifestly unreasonable." Id. OAG

---

[7] Act of July 23, 1970, P.L. 563, as amended, 43 P.S. §§ 1101.101-1101.2301.

7

does not assert that the arbitration award violated the essence test, but[8] argues that the arbitration award should be vacated under the public policy exception to the essence test.

The public policy exception was first recognized by our Supreme Court in Westmoreland I. While reaffirming the essence test as the deferential standard to be applied to review of arbitration awards, the Westmoreland I Court also recognized that "important services [are] entrusted to public entities, which are responsible for the health, safety, and welfare of our citizens." Id. at 865. The Court therefore concluded "that the essence test should be subject to a narrow exception by which an arbitrator's award will be vacated if it is violative of the public policy of the Commonwealth." Id. Under this "public policy" exception, "a court should not enforce a grievance arbitration award that contravenes public policy. Such public policy, however, must be well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." Id. at 865-66. Whether an arbitration award violates public policy "is a pure question of law," thus "our standard of review is *de novo*, and our scope of review is plenary." Philadelphia Housing Authority v. American Federation State, County, and Municipal Employees, District Council 33, Local 934, 52 A.3d 1117, 1121 (Pa. 2012).

---

[8] Before the Arbitrator, the Union argued that OAG was collaterally estopped from asserting that Agent Magnotta knowingly presented an unapproved warrant application to the MDJ because the issue was litigated in unemployment compensation proceedings, and Agent Magnotta was awarded benefits. The Union also argued that OAG's delay in investigating Agent Magnotta's conduct, which resulted in a nearly 11-month gap between her actions and the imposition of discipline, warranted a reversal of her discharge. The Arbitrator ruled against the Union on these issues, and the Union does not offer them as an alternative basis on which we could affirm, so we do not consider them.

8

Our evaluation of an arbitration award under the public policy exception involves a three-step analysis. In City of Bradford v. Teamsters Local Union No. 110, 25 A.3d 408 (Pa. Cmwlth. 2011), we stated:

> First, the nature of the conduct leading to the discipline must be identified. Second, we must determine if that conduct implicates a public policy which is "well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." Westmoreland I, . . . 939 A.2d at 866. Third, we must determine if the arbitrator's award poses an unacceptable risk that it will undermine the implicated policy and cause the public employer to breach its lawful obligations or public duty, given the particular circumstances at hand and the factual findings of the arbitrator.

Id. at 414 (footnote omitted). As a final consideration, we are bound by the Arbitrator's findings of fact. Blairsville-Saltsburg School District v. Blairsville-Saltsburg Education Association, 102 A.3d 1049, 1052 (Pa. Cmwlth. 2014), petition for allowance of appeal denied, 109 A.3d 680 (Pa. 2015).

OAG here argues that there is a "well-defined public policy against a law enforcement officer making a reckless misrepresentation in a sworn court filing," and that "Agent Magnotta's conduct directly implicates this policy [where] she recklessly misrepresented in a sworn court filing . . . that she had obtained the approval of [the ADA] for an arrest warrant application when, in fact, she had not." (OAG's Br. at 11.) On that basis, OAG argues that "Agent Magnotta's conduct is in direct conflict with this public policy" and that the Decision directing "OAG to reinstate Agent Magnotta to her former position" undermines that policy and will "cause . . . OAG to breach its lawful obligations and public duty." (OAG's Br. at 11.) OAG repeats its assertion that Agent Magnotta, as a result of her actions, is

9

"Giglio-impaired" and, thus, is unable to carry out her duties effectively because she could jeopardize every future case in which she would be involved.

Applying the City of Bradford framework to the facts as found by the Arbitrator, our first consideration is the nature of the conduct leading to the discipline. OAG contends here that the relevant conduct was Agent Magnotta's making a misrepresentation to the court with reckless disregard for its truth, and the Union takes a more benign view. The Arbitrator viewed the conduct at issue to be Agent Magnotta's handling (or mishandling) of the warrant approval process rather than a misrepresentation to a court with reckless disregard for its truth. (Decision 9-11.)

In so concluding, the Arbitrator considered the evidence regarding Agent Magnotta's handling of the warrant at issue and, as described above, concluded that her conduct was "negligent" and "careless." (Decision at 10.) However, he also found that:

> Agent Magnotta's . . . actions do not implicate her credibility or integrity. [She] did not commit perjury, and she is not guilty of false swearing. She was not deliberately dishonest. She was negligent; she was careless; she was indifferent; and she inexcusably disregarded the required approval process. [The] ADA . . . testified that Agent Magnotta sometimes "took shortcuts." She seemingly did the same here, submitting the warrant for ADA approval, but carelessly neglecting to confirm that such approval was received. But the evidence does not support the conclusion that she intentionally, knowingly, and deliberately falsified the warrant or had any reason to do so.
>
> * * *
>
> The investigation, the Loudermill proceeding, and the arbitration hearing did not reveal any malicious intent by Agent Magnotta to prepare and submit the warrant before securing ADA approval. In fact, when [the] ADA . . . contacted her . . . she immediately reported the situation to her supervisors and promptly withdrew the warrant.

(Decision at 10-12.)

We are bound by the Arbitrator's findings. Blairsville-Saltsburg, 102 A.3d at 1052. OAG's characterization of Agent Magnotta's conduct as "reckless" does not change the fact that the Arbitrator found that her conduct did not rise beyond negligence after his review of the evidence. To the extent that this is a question of law rather than of fact, we conclude that OAG's characterization of Agent Magnotta's actions is not supported by the record made before the Arbitrator.

Our second consideration under City of Bradford is whether Agent Magnotta's conduct implicates a well-defined, dominant public policy. We have no trouble concluding that there is a policy against deliberate, or even reckless, misrepresentations by law enforcement officials in sworn court filings. However, given the Arbitrator's finding that Agent Magnotta was negligent, and that "the evidence does not support the conclusion that she intentionally, knowingly, and deliberately falsified the warrant or had any reason to do so,"[9] (Decision at 11), we

_____

[9] The Arbitrator in this regard found further that:

> Agent Magnotta did not make the decision to arrest [the individual subject of the warrant] . . . . She was not even in the meeting when her supervisors and the FBI made that decision. Although [one of the FBI Agents] may have later disagreed with the decision to arrest, he participated in the meeting in which the decision was made. Agent Magnotta was simply following the directions of her supervisor when she prepared the warrant. She later informed [the individual subject of the warrant] of the warrant to secure his cooperation in the investigation, but she did not seek the warrant for that or any other purpose. She sought the warrant because her supervisor directed her to do so. Further, there is no evidence that Agent Magnotta had any incentive or motivation to rush through the approval process. Again, it was not her decision to arrest [the individual subject of the warrant]. She did not present the warrant to the [MDJ] until four days after she prepared it.

(Decision at 11.)

11

cannot say that Agent Magnotta's conduct implicates a policy against deliberate, or even reckless, misrepresentations by law enforcement officials in sworn court filings.

Our third and final consideration under City of Bradford is whether the Arbitrator's award poses an unacceptable risk that a clear public policy will be undermined if the award is implemented. As we stated in City of Bradford, this prong "allows for consideration of the particular circumstances of the case and any attendant aggravating or mitigating factors . . . [and] draws the necessary balance between the public employer's duty to protect the health, safety and welfare of the citizens it serves, [and] the fair treatment of public employees . . . ." City of Bradford, 25 A.3d at 415.

The Arbitrator's Decision, as quoted above, provides the findings upon which he based his conclusion that Agent Magnotta's conduct gave OAG just cause to discipline, but not terminate, her. (Decision at 9-13.) In addition, the Arbitrator found that Agent Magnotta is a 24-year OAG employee and that "[s]he admitted the mistake, expressed regret for it, and pledged not to repeat her behavior." (Decision at 13.) Although OAG argues that Agent Magnotta's actions render her "Giglio-impaired," and thus unable to carry out her duties effectively because she could jeopardize every future case in which she would be involved, we conclude, as did the Arbitrator, that this assertion is not supported by the record.

As the Arbitrator found, OAG's actions after Agent Magnotta notified it of the issue with the warrant are inconsistent with the alleged Giglio-impairment. The Arbitrator found that "OAG's immediate response to Agent Magnotta's conduct belies the most serious and criminal allegations made against her in the Loudermill notice" and "the fact that Agent Magnotta continued to work in her

12

same capacity and took on new cases refutes the OAG's subsequent determination that her misconduct was so serious that it justified her discharge." (Decision at 12.) In addition, the Arbitrator found no evidence of perjury, false swearing, deliberate dishonesty, or any other conduct that would impact Agent Magnotta's credibility or integrity. We thus conclude that the Arbitrator's Decision does not pose an unacceptable risk that a clear public policy will be undermined if the award is implemented.

The Arbitrator found that Agent Magnotta's conduct warranted substantial discipline but did not rise to the level justifying termination. His findings of fact support this conclusion. Based on our thorough, but narrow, review as prescribed by Westmoreland I and City of Bradford, we affirm the Arbitrator's Decision.

_____
**RENÉE COHN JUBELIRER, Judge**

13

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Office of The Attorney General,         :
                                    :
                  Petitioner     :
                                    :
              v.               :     No. 1553 C.D. 2015
                                    :
Narcotics Agents Regional         :
Committee, FOP Lodge # 74,       :
                                    :
              Respondent   :

## **O R D E R**

      **NOW**, this 26th day of April, 2016, the July 27, 2015 Arbitration Decision and Award issued "In the Matter of Arbitration Between: Narcotics Agents Regional Committee, FOP Lodge #74 and Commonwealth of Pennsylvania, Office of Attorney General (OAG)," American Arbitration Association Case No. 14-20-1400-0327, is **AFFIRMED**.

 

 

_____

                  **RENÉE COHN JUBELIRER, Judge**